John OGUACHUBA, Petitioner-Appellant,

v.

IMMIGRATION AND NATURALIZATION SERVICE and Dale Thomas, Warden of the Metropolitan Correctional Center, Respondents-Appellees.

No. 841, Docket 82–2297.

United States Court of Appeals, Second Circuit.

Argued Feb. 18, 1983.

Decided April 22, 1983.

Peter Hirsch, New York City, for petitioner-appellant.

Michael D. Patrick, Sp. Asst. U.S. Atty., New York City (John S. Martin, Jr., U.S. Atty., S.D.N.Y., Thomas E. Mossley, Sp.

Asst. U.S. Atty., Thomas D. Warren, Asst. U.S. Atty., New York City, of counsel), for respondents-appellees.

James J. Orlow, Philadelphia, Pa. (Lawrence H. Rudnick, Wasserman, Orlow, Ginsberg & Rubin, Philadelphia, Pa., of counsel), for amicus curiae American Immigration Lawyer's Ass'n.

Before VAN GRAAFEILAND, MESKILL and WINTER, Circuit Judges.

WINTER, Circuit Judge:

John Oguachuba appeals from Judge Thomas P. Griesa's denial of an application for attorneys' fees under the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412 (Supp. V 1981). The application followed a grant of Oguachuba's petition for the writ of habeas corpus, Oguachuba v. INS, 82 Civ. 0073 (S.D.N.Y. Jan. 28, 1982). On appeal, Oguachuba and amicus curiae, the American Immigration Lawyer's Association, contend that Oguachuba's conceded history of misconduct did not constitute a "special circumstance" for which attorneys' fees may be denied within the meaning of the EAJA, 28 U.S.C. §§ 2412(d)(1)(A) and (2), and that the government's opposition to Oguachuba's petition for the writ was not "substantially justified" under 28 U.S.C. § 2412(d)(1)(A). In addition, both Oguachuba and amicus claim that the government's opposition to his petition was in bad faith and that attorneys' fees should be awarded under the "bad faith" exception, which permits an award in circumstances in which the common law would have permitted an award against a private party. 28 U.S.C. § 2412(b).

Because we agree with Judge Griesa that Oguachuba's persistent flouting of United States immigration law constituted "special circumstances mak[ing] an award [of attorneys' fees] unjust," 28 U.S.C. § 2412

(d)(1)(A), we need not reach the question of whether the government's position in opposing the petition for a writ of habeas corpus was substantially justified. We also reject as waived Oguachuba's argument that the government proceeded in bad faith.

BACKGROUND

Oguachuba's extraordinary persistence in evading the lawful efforts of the INS to deport him to Nigeria, his flagrant contempt for United States law and the fact that his own decision not to acquiesce in deportation caused his incarceration constitute the "special circumstances" that make it inequitable to award him attorneys' fees under the EAJA. Regrettably, Mr. Oguachuba's exploits must be recounted at some length.

Oguachuba is a Nigerian citizen[1] who entered the United States on February 5, 1975 under a non-immigrant student visa. He attended Spring Arbor College in Spring Arbor, Michigan, until May 1976, when he was dismissed on disciplinary grounds. Oguachuba then transferred to the University of Michigan but soon left during the Spring 1977 semester due to failing grades. The ease with which these academic institutions obtained his departure from their premises sharply contrasts with the difficulties encountered by the INS in obtaining his permanent exit from the United States.

On February 6, 1978, two days after Oguachuba's student visa expired, someone claiming to be Zannie Lee Wesley Oguachuba presented herself at INS offices and sought to have Oguachuba classified as her spouse so he might obtain an immigrant visa. She failed, however, to follow through and INS administrative procedures extinguished her request on September 23, 1978.[2] On February 10, 1978, despite his

---

1. John Oguachuba was born on January 12, 1956 in Enugu, Nigeria.

2. Mrs. Oguachuba claimed that she married John Oguachuba on August 21, 1975 in Baton Rouge, Louisiana after a three week courtship, and that he left for Michigan one week later.

The only objective proof of the marriage submitted to the INS is Mrs. Oguachuba's statement that she was seeking a divorce as of October, 1979. Indeed, Mrs. Oguachuba asserted that she had not seen her husband again after August, 1975, a comment which is difficult to reconcile with her in-person filing in

non-student status, Oguachuba requested and received an extension of his student visa until February 4, 1979. However, he did not leave the country on that date, nor apparently did he seek further extensions of his visa.

After his departure from the University of Michigan, Oguachuba apparently embarked upon a series of anti-social acts which enabled INS agents to locate him during periodic appearances in local Michigan courtrooms. During the immigration proceedings which followed his first arrest, on June 8, 1979, the INS dropped its allegation that Oguachuba had failed to comply with his non-immigrant status, and Oguachuba, represented by counsel, conceded that he was a native citizen of Nigeria who had overstayed his February 4, 1979 departure date without authorization from the Service. The Immigration Judge then granted Oguachuba's request to be permitted voluntary departure from the United States at his own expense on or before August 21, 1979. The order included the standard proviso that if Oguachuba failed to depart by that date, an order requiring his deportation would become effective immediately.

On that date, Oguachuba appeared at the INS office in Detroit and requested an extension of his voluntary departure on the ground that his marriage to an American citizen entitled him to an immigrant visa. He stated that his wife could not appear on his behalf because she was in Baton Rouge, Louisiana visiting her ailing mother. He further represented that they were unable to afford a ticket north since she would have to return to her mother's bedside directly after the hearing but stated that Mrs. Oguachuba would be returning to school in Michigan in September anyway. On these grounds, he was granted a stay of departure until September 21, 1979. The evanescent Mrs. Oguachuba never appeared by that date and Oguachuba himself was nowhere to be found. Accordingly, the order of deportation went into effect and Oguachuba was sent a notice directing him to surrender for deportation on October 11, 1979. When he failed to surrender, a warrant was issued for his immediate arrest and deportation. The INS apprehended him on October 18, 1979, in a Michigan courtroom awaiting sentencing on an unrelated charge.

On October 19, 1979, the INS began a prolonged quest to secure the necessary travel documents from the Nigerian embassy in New York in order to return Oguachuba to Nigeria. The target date was October 23, 1979. By December 20, 1979, the papers still had not been issued and there is reason to suspect that an embassy staff member in league with Oguachuba caused the delay. On December 20, two INS agents went to the embassy to be interviewed regarding Oguachuba's status and to secure the travel documents. Upon their arrival, the embassy staff member told them that Oguachuba's presence was necessary. The agents then returned with Oguachuba in tow and were directed to wait outside the official's office while he interviewed Oguachuba in private. The agents were then sent to the consulate's office to be interviewed themselves. As they left, Oguachuba was still in the official's office. When they returned, he was gone and, once again, nowhere to be found.

Eighteen months later, the INS caught up with Oguachuba in Pittsburgh, California, following his arrest on a traffic warrant. On June 24, 1981, with Oguachuba in INS custody, the Service contacted the Nigerian consulate in San Francisco to obtain the travel documents. The next day, that consulate provided the necessary papers. On July 2, 1981, Oguachuba was escorted to Kennedy International Airport by INS agents and placed on a flight to Nigeria.

Three days later, Oguachuba reappeared at Kennedy Airport, first seeking readmission to the United States as a citizen and then asserting he was a citizen or resident

Michigan of a petition to have Oguachuba declared her spouse for immigration purposes. Moreover, on numerous occasions, Oguachuba described himself to law enforcement personnel as being unmarried.

of Liberia who was eligible for United States citizenship but who had lost both his luggage and Liberian passport. After telling a series of inconsistent but imaginative stories to customs officers at Kennedy, Oguachuba's identity emerged and he was placed under INS custody pending deportation to Nigeria.

Thereafter, diligent efforts on the part of the INS to obtain new travel documents for Oguachuba from Nigerian consular officials in Washington, San Francisco, and New York failed. On January 6, 1982, exactly six months and one day after he was taken into custody by the INS, Oguachuba, through counsel, filed a petition for habeas corpus challenging his continued detention as unlawful under the six month limit of section 242(c) of the Immigration and Nationality Act, 8 U.S.C. § 1252(c) (1976).[3] In its response, the government argued that it was entitled to six "unhampered" months within which to deport an alien and that the recalcitrance of Nigerian officials amounted to an obstruction tolling the statutory period. On January 25, 1982, the district court ruled that, notwithstanding

the laundry list of Oguachuba's misdeeds, the six month limit on detention in section 242(c) was absolute and any detention beyond that time was unlawful. Nevertheless, the district court stayed the writ pending an expedited appeal by the government. The government's motion to expedite its appeal was granted on February 8, 1982. However, Nigerian travel documents were obtained on February 3 and Oguachuba was deported two days later. On March 4, 1982, the appeal was withdrawn as moot.

On February 22, 1982, Oguachuba's counsel submitted a letter in his own name and on his own behalf applying for $2,104.80 in attorneys' fees under the EAJA. He asserted that the government's position regarding section 242(c) during the habeas corpus application had been "untenable" and therefore not "substantially justified." On September 22, 1982, after receiving briefs from both sides, the district court denied the motion on the ground that it would be a travesty of justice to award fees to petitioner. Petitioner had long since agreed to voluntary deportation, and had then spent years in various de-

---

**3.** 8 U.S.C. § 1252(c) states:

When a final order of deportation under administrative processes is made against any alien, the Attorney General shall have a period of six months from the date of such order, or, if judicial review is had, then from the date of the final order of the court, within which to effect the alien's departure from the United States, during which period, at the Attorney General's discretion, the alien may be detained, released on bond in an amount and containing such conditions as the Attorney General may prescribe, or released on such other condition as the Attorney General may prescribe. Any court of competent jurisdiction shall have authority to review or revise any determination of the Attorney General concerning detention, release on bond, or other release during such six-month period upon a conclusive showing in habeas corpus proceedings that the Attorney General is not proceeding with such reasonable dispatch as may be warranted by the particular facts and circumstances in the case of any alien to effect such alien's departure from the United States within such six-month period. If deportation has not been practicable, advisable, or possible, or departure of the alien from the United States under the order of deportation has not been effected, within such six-month period, the alien shall become

subject to such further supervision and detention pending eventual deportation as is authorized in this section. The Attorney General is authorized and directed to arrange for appropriate places of detention for those aliens whom he shall take into custody and detain under this section. Where no Federal buildings are available or buildings adapted or suitably located for the purpose are available for rental, the Attorney General is authorized, notwithstanding section 5 of Title 41 or section 278a of Title 40 to expend, from the appropriation provided for the administration and enforcement of the immigration laws, such amounts as may be necessary for the acquisition of land and the erection, acquisition, maintenance, operation, remodeling, or repair of buildings, sheds, and office quarters (including living quarters for officers where none are otherwise available), and adjunct facilities, necessary for the detention of aliens. For the purposes of this section an order of deportation heretofore or hereafter entered against an alien in legal detention or confinement, other than under an immigration process, shall be considered as being made as of the moment he is released from such detention or confinement, and not prior thereto.

vices to avoid carrying out his agreement. He was under a duty to leave the country. It was a flagrant violation of this duty to remain in this country, whether incarcerated or not. The fact that, at the time of petitioner's habeas corpus proceeding, the INS had violated the literal requirements of the six-month statute, does not detract from the overriding circumstance of petitioner's persistent defiance of United States law.

Meanwhile, on June 12, 1982, having remained out of the country for an extended stay of four months, Oguachuba reappeared at Kennedy Airport claiming status as a United States citizen deported from Zurich, Switzerland. Oguachuba had arrived in Zurich from Geneva on June 2, 1982, and claimed to be a United States citizen who had lost his passport. Upon inquiries at the United States consulate, the truth emerged and Swiss officials put Oguachuba on a plane back to Nigeria. Although the means of his turnaround in Nigeria remain obscure, Oguachuba returned to Zurich a short time later and began the whole ruse again. However, this time he succeeded in convincing a Swiss immigration agent that he was actually "John Davis," a United States citizen who had lost his passport. The Swiss inspector authorized Oguachuba's deportation from Switzerland to the United States without gaining authorization from the United States Government. Upon arrival in the United States, Oguachuba was once more detained by the INS. The Service initially sought to exclude him as an alien previously deported and as not being in possession of a valid passport or entry document, 8 U.S.C. §§ 1182(a)(17), (20) and (26) (1976). Oguachuba contested his exclusion and, on November 15, 1982, the Immigration Judge held that during Oguachuba's four month absence from the United States between February and June, 1982, he had not been accepted by a foreign country and, therefore, was not properly excludable but rather remained under the original deportation order. The Service is presently appealing the Immigration Judge's order and Oguachuba apparently remains incarcerated.

During his present stay in the United States, Oguachuba filed the instant appeal through his attorney, seeking review of the district court's September 22, 1982 decision denying him attorneys' fees under the EAJA. Shortly thereafter, Oguachuba filed a motion to proceed *in forma pauperis,* which was denied by the district court which found the appeal "frivolous" and "not taken in good faith."

## DISCUSSION

The Equal Access to Justice Act, 28 U.S.C. § 2412(d)(1)(A), states in pertinent part:

Except as otherwise specifically provided by statute, a court shall award to a prevailing party other than the United States fees and other expenses, in addition to any costs awarded pursuant to subsection (a), incurred by that party in any civil action (other than cases sounding in tort) brought by or against the United States in any court having jurisdiction of that action, unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust.

We note at the outset that the statute allows an award of "fees and other expenses" to the "prevailing party" whereas the original application for attorneys' fees involved in the instant appeal was made in the name of Oguachuba's counsel. The claim that a denial of attorneys' fees penalizes the lawyer but not the client exhibits a fundamental confusion about the nature of that relationship both in our legal system and under the EAJA. Whether an award of attorneys' fees under the Act ultimately redounds to the benefit of counsel depends upon the private contractual arrangements between the attorney and the client. A retainer or similar agreement may provide for payment of counsel as the litigation proceeds, an award of fees reimbursing a client. Other arrangements may condition part or all of a fee upon the outcome or upon an award by the court. Under the

circumstances and given the statutory language, we believe that counsel has no standing to apply to the public fisc for payment. If the instant appeal were simply based upon the application filed by Oguachuba's lawyer in his own behalf, we would thus be forced to dismiss. However, Oguachuba filed notice of this appeal in his own name. While doubt may reasonably exist as to whether this substitution cures the defect in the initial application for fees, Judge Griesa did reach the merits and we will treat Oguachuba's appeal as retroactively adopting his counsel's application for fees and also reach the merits.

The EAJA was intended to "remove an obstacle to contesting unreasonable governmental action through litigation." *Goldhaber v. Foley*, 698 F.2d 193, 197 (3rd Cir. 1983). Thus, counsel fees may be awarded to parties prevailing against the government unless the government's position is "substantially justified," or "special circumstances make an award unjust." We may assume *arguendo* the government's position in resisting the habeas petition was not substantially justified within the meaning of the statute,[4] since we fully agree with the district court that Oguachuba's misconduct constitutes a special circumstance rendering an award of attorneys' fees unjust.

In elaborating upon the "special circumstances" exception, the House Report accompanying the EAJA concluded,

Furthermore, the Government should not be held liable where special circumstances would make an award unjust. This "safety valve" helps to insure that the Government is not deterred from advancing in good faith the novel but credible extensions and interpretations of the law that often underlie vigorous enforcement efforts. *It also gives the court discretion to deny awards where equitable considerations dictate an award should not be made.*

H.R.Rep. No. 1418, 96th Cong., 2d Sess. at 11, *reprinted in* 1980 U.S.Code Cong. & Ad. News, 4953, 4984, 4990 (emphasis added). The EAJA thus explicitly directs a court to apply traditional equitable principles in ruling upon an application for counsel fees by a prevailing party.

The EAJA differs from other statutes, such as the Sherman Act and Civil Rights legislation, which authorize an award of counsel fees to a party prevailing on claims arising under the particular legislation. Awards pursuant to such legislation are usually the result of Congress' perception of the importance of the underlying statutory policies, of the need to encourage litigation as a means of enforcement of those policies or of a desire to see that the damages awarded plaintiffs in such cases are not diminished by the need to pay counsel. The EAJA differs in that it is not tied to particular governmental policies but applies generally to civil litigation involving the government. The purpose of the EAJA is not to enhance enforcement of affirmative governmental policies but to deter the government from bringing unfounded suits or engaging in arbitrary or unjust administrative behavior. That goal is in part achieved by rectifying the "disparity in resources and expertise of . . . individuals and their government." *Id.* at 6, 1980 U.S.Code Cong. & Ad.News at 4984. As the House Report states:

Providing an award of fees to a prevailing party represents one way to improve citizen access to courts and administrative proceedings. When there is an opportunity to recover costs, a party does not have to choose between acquiescing to an unreasonable Government order or prevailing to his financial detriment. Thus, by allowing an award of reasonable fees and expenses against the Government when its action is not substantially justified, S. 265 provides individuals an effective legal or administrative remedy where none now exists. By allowing a

---

4. Oguachuba also argues on appeal that the government's resistance to his petition was in bad faith and that, therefore, he is entitled to attorneys' fees under the so-called American Rule, codified in the EAJA at 28 U.S.C. § 2412(b). Oguachuba failed to raise this argument before the district court and we hold he is precluded from doing so on appeal.

decision to contest Government action to be based on the merits of the case rather than the cost of litigating, S. 265 helps assure that administrative decisions reflect informed deliberation. In so doing, fee-shifting becomes an instrument for curbing excessive regulation and the unreasonable exercise. of Government authority.

*Id.* at 12, 1980 U.S.Code Cong. & Ad.News at 4991.

In viewing applications for such awards in the context of general equitable principles, we are not required to limit our scrutiny to a single action or claim on which the applicant succeeded but must view the application in light of all the circumstances. The statutory purpose of determining unreasonable behavior by the government, for example, does not dictate an automatic award of counsel fees to a persistent litigant who happens to prevail as to one claim among many others which are meritless.

The application of equitable principles in the instant case clearly calls for a denial of counsel fees. For four years Oguachuba has violated American law in numerous ways hoping to cause a technical error by the INS which would allow him to remain in this country. While he prevailed in his petition for a writ of habeas corpus, he would not have been incarcerated in the first place but for his notorious and repeated violations of United States immigration law. Moreover, at all times during the incarceration in question, Oguachuba was free to end his detention by voluntarily returning to Nigeria. It is plainly inequitable to allow Oguachuba to flout American law in this fashion and then to require the public fisc to support his legal bills to terminate his detention through a quirk in American law when, at any point, he could have ended that detention himself. In classic equity terms, Oguachuba is without clean hands.

Affirmed.