Leona PELLERIN, Appellant,

v.

Jesse BROWN, Secretary of Veterans
Affairs, Appellee.

No. 94–687.

United States Court of Veterans Appeals.

June 13, 1997.

William G. Smith was on the pleadings for appellant.

Mary Lou Keener, General Counsel; Ron Garvin, Assistant General Counsel; David W. Engel, Deputy Assistant General Counsel; and A.M. Fent, Washington, DC, were on the pleadings, for appellee.

Before NEBEKER, Chief Judge, and KRAMER and HOLDAWAY, Judges.

HOLDAWAY, Judge, filed the opinion of the Court. KRAMER, Judge, filed a dissenting opinion.

HOLDAWAY, Judge:

The appellant has applied for attorney fees and expenses under the Equal Access to Justice Act (EAJA), 28 U.S.C. § 2412(d)(2)(F). The Court will deny the appellant's EAJA application because the position of the Secretary was substantially justified.

## I. FACTUAL BACKGROUND

On April 29, 1994, a Board of Veterans' Appeals (BVA or Board) decision in the case of Alcide D. Pellerin, the veteran, determined that no new and material evidence had been submitted to reopen a claim of entitlement to service connection for lumbar spine and right leg disorders. The evidence submitted in an effort to reopen the veteran's claims included the veteran's testimony at a May 1989 hearing. In the Board's decision, one of the reasons given for the refusal to reopen was that the Board refused to accept the veteran, a physician, as an expert witness because of his "stake in the outcome." *Alcide D. Pellerin*, BVA 89–39449, at 11 (Apr. 29, 1994). On August 22, 1994, the veteran appealed the Board's decision to this Court. In October 1994, the Secretary informed the veteran that he planned to move for remand. Short-

ly thereafter, the veteran retained representation. On March 15, 1995, the parties filed a joint motion proposing that the Board's decision be vacated and the matter remanded for readjudication. The joint motion stated:

> The motion is based on an evidentiary issue of first impression before this Court, but is foreshadowed by the Court's jurisprudence on reopened claims generally. In the decision on appeal, the BVA refused to treat the testimony of [the] appellant, a trained physician, as expert witness evidence, because of his self-interest in the outcome. On this basis, *among others*, the BVA refused to reopen his claims. However, the parties agree that where a physician-appellant chooses to act as his own medical expert, the BVA must consider his testimony as expert evidence, although the BVA is not bound to accept such testimony as determinative. Because the BVA refused to consider [the] appellant's testimony for reopening purposes, the present appeal should be remanded for readjudication.

Motion at 1 (emphasis added). As a basis for the parties' conclusion, the joint motion cited, inter alia, *Justus v. Principi*, 3 Vet.App. 510 (1992), and *Espiritu v. Derwinski*, 2 Vet.App. 492 (1992). On March 20, 1995, the Court, in a single judge action, granted the joint motion, vacated the Board's decision, and remanded the matter.

On April 10, 1995, the veteran filed the EAJA application that is the subject of this decision. In the application, he (1) made a showing that he was a "prevailing party" by asserting such status and by demonstrating how he had attained such status; (2) made a showing that he is a party eligible for an award under the EAJA by stating that his net worth was less than $2,000,000 when the appeal was filed on August 22, 1994; (3) asserted that the position of the Secretary was not substantially justified; and (4) included an itemized statement of the fees and expenses sought (43.1 hours at a rate of $122.38 per hour, for a total fee of $5,274.58, and an additional $65.52 for expenses—total amount of fees and costs, $5,340.10) supported by an affidavit from the veteran's counsel. Because the veteran satisfied the jurisdictional content requirements of 28 U.S.C. § 2412(d)(1)(B) within the applicable 30–day application period, his EAJA application was timely. *See Bazalo v. Brown*, 9 Vet.App. 304, 310 (1996) (en banc); *see also Locher v. Brown*, 9 Vet.App. 535, 537 (1996).

On April 26, 1995, counsel for the appellant notified the Court that the veteran, Alcide D. Pellerin, had died on April 16, 1995. On May 11, 1995, counsel for the appellant filed a motion to substitute Leona Pellerin, widow of the veteran, pursuant to *Cohen v. Brown*, 8 Vet.App. 5 (1995). On May 17, 1995, the Court granted the appellant's motion.

On October 6, 1995, the Secretary filed a response to the appellant's application. He argues that the appellant's request for fees should be denied because the position of VA was substantially justified in the underlying merits administrative decisionmaking and in the litigation in this Court, and that there are special circumstances that make an attorney fees award unjust. He also argues that, in the event the appellant is determined to be entitled to an EAJA award, the fees requested are excessive and should be reduced. The appellant has not raised the issue of the reasonableness of the Secretary's position before the Court, but relies entirely on the "unreasonableness" of the BVA's "position." In light of our determination that the BVA's position was reasonable, the issues as to special circumstances and the excessiveness of the fees requested need not be addressed.

## II. ANALYSIS

■ Because the appellant has alleged that VA's position was not substantially justified, the burden to establish substantial justification rests with the Secretary. *See Olney v. Brown*, 7 Vet.App. 160 (1994); *Stillwell v. Brown*, 6 Vet.App. 291 (1994). Although this burden rests with the Secretary, it is well to note that the Supreme Court, in defining "substantially," stated, "We are of the view ... that as between the two commonly used connotations of the word 'substantially,' the one most naturally conveyed by the phrase before us here is not 'justified to a high degree,' but rather 'justified in substance or in the main'—that is, justified to a degree that would satisfy a reasonable person."

*Pierce v. Underwood,* 487 U.S. 552, 565, 108 S.Ct. 2541, 2550, 101 L.Ed.2d 490 (1988). In this connection, this Court in *Stillwell* noted specifically that in assessing the "reasonableness" of the Government's position, "the evolution of VA benefits law since the creation of this Court has often resulted in new, different, or more stringent requirements for adjudication.... [S]ome cases before this Court are ones of first impression involving good faith arguments of the government that are eventually rejected by the Court." *Stillwell,* 6 Vet.App. at 303. This Court cited with approval the following language from *Roanoke River Basin Ass'n v. Hudson,* 991 F.2d 132, 139 (4th Cir.), *cert. denied,* 510 U.S. 864, 114 S.Ct. 182, 126 L.Ed.2d 141 ( 1993), that even with respect to cases which are not of first impression: "While the EAJA redresses governmental abuse, it was never intended to chill the government's right to litigate or to subject the public fisc to added risk of loss when the government chooses to litigate reasonably substantiated positions, whether or not the position later turns out to be wrong." *Stillwell,* 6 Vet.App. at 303.

Turning to the application of these general principles to this case, we must first determine what exactly was the position of the BVA now under attack and whether that position was "in the main" justified. *Pierce, supra.* As to the first issue, the precise position that the BVA took was that the appellant had failed to produce new and material evidence. One of the BVA's reasons, of several given, for not finding the evidence to be either new or material, was its refusal to accord the appellant-physician status as an "expert witness" insofar as his own "testimony" was concerned. Other reasons given included a failure, assuming, inter alia, the relevance and probativeness of the appellant's testimony, to present a "reasonable possibility" of changing the result given the context of the "old" evidence which included highly persuasive evidence from other physicians who were both specialists and, of course, neutral. A further reason for rejecting the "new" evidence, including much, if not all, of the appellant-physician's own testimony, was its cumulativeness. Dr. Pellerin had been his own witness in the former finally denied proceeding. Considering the

BVA's decision in its entire context, it simply cannot be said that the position of the BVA, i.e., that new and material evidence was not presented, was decisively or even primarily affected by its rejection of the appellant's "expert" testimony. When read in its entirety, the decision, which was exceedingly detailed and thorough and which looks very much like a de facto reopening, appears to be an alternative or "make weight" justification rather than the *raison d'etre* for finding a lack of new and material evidence. In point of fact, as previously noted, in the part of its analysis preceding the language as to the appellant's expertise and "stake" in the case, the BVA expressly assumed his testimony's relevance and probativeness, for purposes of its "reasonable possibility" analysis. The "reasonable possibility" analysis was the principal *ratio decidendi* of its decision rather than the subsidiary issue as to the appellant's expertise. In this connection, it must be noted that the joint remand motion, agreed to by the appellant and his counsel, conceded that refusing to accord expertise to the appellant was only one basis "among others" for the BVA's refusal to reopen. In sum, it does not appear that the issue of the appellant's expertise was in any way decisive in the BVA's ultimate position that new and material evidence had not been presented.

Nonetheless, for whatever reasons, the Secretary elected to move for a remand solely because of the "failure" to accord expert status to the appellant's testimony, even though, somewhat inconsistently, he recognized that the decision of the Board was based at least in part on other considerations. In so doing, and as agreed to by the appellant and his counsel, it was specifically conceded that the issue presented was a case of first impression. The parties also agreed that this case of first impression was "foreshadowed by the Court's jurisprudence on reopened claims generally." It is difficult to imagine what this latter point means. Obviously, all cases that come before this Court, of first impression or otherwise, are "foreshadowed" by the cases that have been decided beforehand. That is the process of law by *stare decisis.* It is in the give and take of the adversary process that the necessary re-

**418**

finements are made and "glosses" added to existing precedent, thus creating new precedent in analogous but distinguishable cases. In this instance, an exceedingly novel issue was presented: the claimant, himself a physician, giving expert, but obviously non-neutral, evidence in his own case. That was a fact situation not presented by *Justus, supra,* where a neutral expert was involved in disputing other neutral experts. In any event, a concession by the appellant that this novel case was a case of first impression is necessarily also a concession that, while analogous, the case was distinguishable and could not be decided except as an extension of *Justus,* i.e., a new precedent. Of course, it would have been preferable had the BVA explicitly recognized *Justus* and either "followed" it, which probably would have made no difference as to the outcome in any event, given the "make weight" nature of the expertise determination, *supra,* or "distinguished" it. *Cf. Kightly v. Brown,* 6 Vet.App. 200 (1994); *Reonal v. Brown,* 5 Vet.App. 458 (1993). These two cases are illustrative of instances where this Court accepted pre-opening credibility determinations.

Our dissenting colleague states that this case does not fit into any of the recognized exceptions to the *Justus* rule. However, the majority disagrees. In *Reonal,* the presumption of credibility did not arise because the physician "relied upon appellant's account of his medical history and service background, recitations which had already been *rejected*" by the regional office. *Reonal,* 5 Vet.App. at 460–61 (emphasis in the original). In *Kightly,* the opining physician's statement was rejected because it was found to be based on an "inaccurate history" as given by the veteran. *Kightly,* 6 Vet.App. at 206. In the present case, the physician-veteran is similarly relying on a medical history and service background that have already been rejected by VA. Accordingly, and despite the Secretary's concession in his December 1994 motion to remand that these exceptions were not applicable, the Court finds that the presumption of credibility should not have arisen, and Dr. Pellerin's testimony could have plausibly been rejected as being based on a veteran's own account and medical history which had previously been rejected by VA. Where the

dissent would argue that the "proper course, ... would have been to accept the veteran's testimony as expert evidence for reopening purposes," the majority holds to the contrary.

The essence of the case boils down to whether this Court should find a lack of substantial justification merely because the BVA, a nonjudicial body, failed to cite a possibly pertinent but not a dispositive case, that the parties have agreed was not directly controlling, and that the BVA therefore, need not have necessarily followed. Extension of the substantial justification doctrine to require citation of analogous cases of first impression is not only unwarranted but would be mischievous to the worthy goal of ensuring that the adversary process is given full freedom to operate in cases of first impression. The adoption of such a drastic rule by assuming, in effect, applicability of non-controlling but analogous precedent, could easily "chill the Government's right to litigate" in those instances where an issue involves the extension of an existing precedent. *Roanoke River Basin Ass'n,* 991 F.2d at 139. It is to the benefit of all that this process take place in the full light of day and not by remands based on possibly pertinent but clearly distinguishable precedent. Although the Government may ultimately lose in such situations, it should have a fair chance to challenge issues raised without further risk to the public fisc on novel issues of first impression. Because we find that the BVA's position that the appellant failed to produce new and material evidence was not exclusively or even primarily based on failure to accord the appellant expert status and because we find that the issue presented to the BVA was a case of first impression, it is our determination that the Board's decision was "in the main" substantially justified. *Pierce,* 487 U.S. at 565, 108 S.Ct. at 2550.

### III. CONCLUSION

The appellant's application for attorney fees is DENIED.

KRAMER, Judge, dissenting:

### I.

Because the appellant has alleged that VA's position was not substantially justified,

the burden to demonstrate substantial justification rests with the Secretary. *See Olney v. Brown,* 7 Vet.App. 160, 162 (1994); *Stillwell v. Brown,* 6 Vet.App. 291, 301 (1994); *Cook v. Brown,* 6 Vet.App. 226, 237 (1994), *aff'd,* 68 F.3d 447 (Fed.Cir.1995). The Court has adopted the following test for substantial justification:

> [T]he VA must demonstrate the reasonableness, in law and fact, of the position of the VA in a matter before the Court, and of the action or failure to act by the VA in a matter before the VA, based upon the totality of the circumstances, including merits, conduct, reasons given, and consistency with judicial precedent and VA policy with respect to such position, and action or failure to act, as reflected in the record on appeal and the filings of the parties before the Court.

*Stillwell,* 6 Vet.App. at 302 (citing *Pierce v. Underwood,* 487 U.S. 552, 565, 108 S.Ct. 2541, 2550, 101 L.Ed.2d 490 (1988); *Gavette v. OPM,* 808 F.2d 1456, 1467 (Fed.Cir.1986); and *Essex Electro Engineers, Inc. v. United States,* 757 F.2d 247, 252 (Fed.Cir.1985)). In order to prevail, the Secretary must show substantial justification for both his administrative and litigation positions. *See Locher v. Brown,* 9 Vet.App. 535, 537 (1996); *ZP v. Brown,* 8 Vet.App. 303, 304 (1995) (per curiam order); *Felton v. Brown,* 7 Vet.App. 276, 279–80 (1994). The Court has also adopted the Federal Circuit's "reasonableness" test, summarizing the guidelines as follows:

> (1) [R]easonableness is determined by the totality of circumstances, and not by any single-factor approach; (2) reasonableness "turns on what support in law and fact the government offered in defending its case, and ... the merits of the agency decision constitute only one factor in evaluating the justification for the government's litigating position in court," *Essex,* 757 F.2d at 253 (citation omitted); (3) whether the government "drag[ged] its feet," or "cooperated in speedily resolving the litigation," *id.;* and (4) whether the government "departed from established policy in such a way as to

single out a particular private party," *id.* at 254 (citation omitted).

*Stillwell,* 6 Vet.App. at 302.

## II.

As to VA's position in the administrative process, the Secretary argues that the April 29, 1994, BVA decision was reasonable, notwithstanding its error in failing to treat the testimony of the appellant, a trained physician, as expert witness evidence, because this was an evidentiary issue of first impression before this Court. The appellant contends that although an evidentiary issue of first impression existed in this case, it was not an issue that required the Court's interpretation of the law because the law was well settled. For the reasons that follow, I believe that the Secretary's position in the administrative phrase was not reasonable and thus not substantially justified.

Pursuant to this Court's decision in *Espiritu v. Derwinski,* 2 Vet.App. 492 (1992), expert testimony is admissible where the witness is qualified as an expert, and the question before the fact finder involves specialized knowledge. *Id.* at 495. In *Espiritu,* the appellant, in her attempt to reopen her claim for service connection for the cause of her husband's death, submitted statements from her lay neighbors who had not been trained in medicine, that causally linked the husband's death to his service-connected conditions. *Ibid.* The Court found that these statements were not sufficient to reopen the appellant's claim because her neighbors were not capable of providing a probative diagnosis as to the cause of her husband's death. *Ibid.* Moreover, pursuant to this Court's decision in *Justus v. Principi,* 3 Vet.App. 510 (1992), the credibility of evidence submitted to reopen a claim must be presumed. *Id.* at 513. The Court has recognized certain exceptions to the *Justus* rule where the physician's opinion is based upon an inaccurate factual premise (*see Kightly v. Brown,* 6 Vet.App. 200, 206 (1994); *Reonal v. Brown,* 5 Vet.App. 458, 460–61 (1993)), such as where a physician's opinion is formed on the basis of a medical history and service background provided by the veteran but previously rejected by VA (*see Elkins v. Brown,* 5 Vet.App. 474, 478

(1993)). In these cases, the credibility of medical evidence need not be presumed.

In this case, the BVA did not presume the credibility of the testimony as required by *Justus* even though the case did not fit into any of the recognized exceptions to the *Justus* rule, and, contrary to *Espiritu*, did not treat the veteran's testimony as that of an expert witness. Instead, the BVA presumed that the veteran's testimony was not credible "in light of his stake in the outcome of his mission to obtain additional VA compensation." *Pellerin*, BVA 89–39449, at 12 (Apr. 29, 1994). The proper course, according to the Court's case law decided almost two years before the BVA decision, would have been to accept the veteran's testimony as expert evidence for reopening purposes, then to state fully the reasons or bases for rejecting or accepting such expert testimony in weighing all of the evidence, both old and new. *See Moray v. Brown*, 5 Vet.App. 211, 213 (1993). Admittedly, these cases do not address specifically the factual situation where the appellant is also the expert. Because of this lack of specificity, the majority has determined that the issue is one of first impression and that under *Stillwell* the Secretary's position was substantially justified. However, the Secretary himself has conceded that the BVA acted improperly in not applying the principle that "where a physician-appellant chooses to act as his own medical expert, the BVA must consider his testimony as expert evidence, although the BVA is not bound to accept such testimony as determinative." Joint Motion at 1. The majority notes that the presumption of credibility does not attach because the appellant's medical history, upon which his medical opinion rested, was rejected by VA. I find such a statement indeed curious in view of the following: First, other than the BVA decision, a record on appeal has never been transmitted to the Court, from which such a VA rejection could be determined; and, second, the Secretary's motion for remand in the underlying case specifically indicated that the caselaw cited by the majority, under which the presumption of credibility would not attach, is *not* applicable here, stating that "exceptions to the *Justus* rule are not present here." Secretary's Motion for Remand at 5. My own review of the BVA decision indicates that VA never rejected any factual historical predicate upon which the appellant's medical opinion rested—only the medical opinion itself. Even assuming the law did not require the application of *Espiritu* and *Justus* to the testimony of a physician-appellant, there simply was no substantial justification for the BVA's failure to address this issue. Therefore, I believe that the Secretary's position in the administrative phrase was not reasonable and, thus, not substantially justified.

Finally, I note the majority's seemingly persuasive argument as to why there was substantial justification for the BVA's determination that no new and material evidence had been presented notwithstanding the BVA's failure to address properly the testimony of the veteran, Dr. Pellerin. The majority states:

> Other reasons given included a failure, assuming, inter alia, the relevance and probativeness of the appellant's testimony, to present a "reasonable possibility" of changing the result given the context of the "old" evidence which included highly persuasive evidence from other physicians who were both specialists and, of course, neutral. A further reason for rejecting the "new" evidence, including much, if not all, of the appellant-physician's own testimony, was its cumulativeness. Dr. Pellerin had been his own witness in the former finally denied proceeding.

(*ante* at 417).

This analysis, however, fails for two reasons. First, it bears little resemblance to the BVA's actual discourse, which I have set forth as an appendix, and for which I ask the reader's indulgence. Second, in essence, the majority states that the BVA's treatment of Dr. Pellerin's testimony is not prejudicial to the appellant. *See* 38 U.S.C. § 7261(b); *Kehoskie v. Derwinski*, 2 Vet.App. 31, 34 (1991). However, even the Secretary, by initiating a joint motion for remand for the specific purpose of requiring the BVA to address Dr. Pellerin's expert testimony rather than asking for affirmance of the BVA decision on the basis of harmless error, concedes that such is not the case.

Having concluded that the Secretary was not substantially justified in his administrative position, there is no need to determine whether the government's litigation position before this Court was substantially justified. *See Locher* and *ZP*, both *supra*.

## III.

Pursuant to 28 U.S.C. § 2412(d)(1)(A), a party is not eligible for an award of fees and expenses under the EAJA if the Court determines that "special circumstances make an award unjust." Here, the Secretary argues that special circumstances exist because the parties adopted the Secretary's joint motion for remand and the appellant's attorney made no significant contribution to the proceedings. In *Doria v. Brown*, this Court concluded that, although "special circumstances" were not defined in the EAJA, the legislative history "recognized two distinct categories of special circumstances: First, situations where the government proffers novel but credible extensions and interpretations of the law; and second, situations 'where equitable considerations dictate an award should not be made'" i.e., "a prevailing party's unclean hands." *Doria*, 8 Vet. App. 157, 162 (1995) (quoting H.R. REP. No. 1418, 96th Cong., 2d Sess. 11 (1980), *reprinted in* 1980 U.S.C.C.A.N. 4953, 4984, 4990); *see Brinker v. Guiffrida*, 798 F.2d 661, 667 (3d Cir.1986); *Oguachuba v. INS*, 706 F.2d 93, 98–99 (2d Cir.1983) (finding EAJA special circumstances and denying award where appellant was "without clean hands" because of "notorious and repeated violations of United States immigration law"); *see also Locher*, 9 Vet.App. at 540. The government bears the burden of proof to demonstrate the existence of such circumstances. *See Doria*, 8 Vet. App. at 163.

Applying *Doria* to the Secretary's argument, it becomes readily clear that such argument simply fails to come within either category of special circumstances. Accordingly, I believe that the "special circumstances" exception of 28 U.S.C. § 2412(d)(1)(A) cannot bar the appellant's application for attorney fees and expenses.

I respectfully dissent.

## APPENDIX

## IN THE APPEAL OF ALCIDE D. PELLERIN

C 8 328 719

BOARD OF VETERANS' APPEALS
WASHINGTON, D.C. 20420

Docket No. 89–39 449

Date April 29, 1994

### THE ISSUES

Whether new and material evidence has been presented to permit the veteran to reopen a previously denied claim of entitlement to service connection for lumbar spine and right leg disorders.

### REPRESENTATION

Appellant represented by: Ronald J. Marzullo, Attorney

### WITNESSES AT HEARING ON APPEAL

Appellant, Mr. Loomis, Mr. Dereng, and Mr. and Mrs. Kelly

### ATTORNEY FOR THE BOARD

Brian J. Milmoe, Counsel

### INTRODUCTION

The veteran served on active duty from May 1944 to February 1946.

This appeal arises from the St. Petersburg, Florida, Regional Office. In August 1990, the Board of Veterans' Appeals (BVA) denied entitlement of the veteran to service connection for lumbar spine and right lower extremity disorders and a temporary total rating based on convalescence following a period of hospitalization in February 1985. Thereafter, an appeal of such decision was taken to the United States Court of Veterans Appeals, hereinafter the Court, which granted the unopposed motion of the Secretary of Veterans Affairs to remand the matter noted on the title page of the instant decision to BVA. *Pellerin v. Brown*, No. 91–0445 (U.S.Vet. App. Sep. 20, 1993). As such, the BVA's decision of August 1990 was vacated and the matter was remanded, pursuant to 38

422

U.S.C.A. § 7252(a) (West 1991), for compliance with the instructions in the motion to remand which were incorporated into the Court's order by reference. In summary, the Secretary noted that additional BVA action was required in light of various Court decisions which were entered subsequent to the BVA decision in question and which clarified the requirements for the reopening of a claim that had previously been denied by final rating action. The Secretary's motion did not refer to the BVA's disposition of the temporary total rating issue in the August 1990 decision, and, as such, the BVA's action regarding that matter remains in effect.

Following the return of the case to BVA in October 1993, the veteran's attorney was advised in writing of his right to submit additional argument, but no such argument was received within the prescribed time limit.

The veteran's entitlement to service connection for back and right leg disorders was denied by BVA in a decision entered in December 1948 and such decision was affirmed on reconsideration by BVA in a decision of December 1972. Service connection for a back disorder, secondary to service-connected pes planus, was denied by BVA in a decision of April 1968. BVA again denied entitlement of the veteran to service connection for back and right leg disorders in an August 1976 decision, which was reconsidered and affirmed in a decision entered in December 1976. All of the prior decisions, including those undertaken upon reconsideration, were reconsidered by BVA and affirmed in a decision of July 1978. At issue in this appeal is whether new and material evidence has been submitted to reopen the veteran's previously denied claim of entitlement to service connection for lumbar spine and right leg disorders.

## CONTENTIONS OF APPELLANT ON APPEAL

It is contended by the veteran that new and material evidence has been presented to reopen his previously denied claim of entitlement to service connection for lumbar spine and right leg disorders. Allegations are advanced, to the effect that certain congenital anomalies of his lumbar spine were asymptomatic prior to service and otherwise imposed no functional limitations or in any way limited his participation in various sporting activities. Excessive strain caused by the rigors of basic training, including a litter carrying exercise, aggravated the veteran's preexisting back disorder and later progressed to spinal stenosis or obstruction of the spinal cord. There reportedly was inservice development of progressive muscle atrophy and sensory deficits of the right leg, due to the lower back difficulties. Notwithstanding the preservice osteomyelitis of the right tibia, it is argued that the presumption of soundness with respect to the lumbar spine and right leg disorders was not overcome by clear and unmistakable evidence that either entity preexisted his entrance onto active duty. It is felt that the opinion of independent medical experts obtained in March 1978 concerning his back and right leg disorders was tainted by the failure of the Department of Veterans Affairs (VA) to provide the experts with actual X-rays of the veteran's spine. Other allegations are set forth regarding the expert opinion secured by BVA in May 1976 as to the relationship of such expert to VA. Another opinion from a different medical expert is sought.

## DECISION OF BVA

BVA, in accordance with the provisions of 38 U.S.C.A. § 7104 (West 1991), has reviewed and considered all of the evidence and material of record in the veteran's claims file(s). BVA has determined that only those items listed in the "Certified List" attached to this decision and incorporated by reference herein are relevant evidence in the consideration of the veteran's claim. Based on its review of the relevant evidence in this matter, and for the following reasons and bases, it is the decision of BVA that new and material evidence has not been presented with which to reopen the veteran's previously denied claim of entitlement to service connection for lumbar spine and right leg disorders.

## FINDINGS OF FACT

1. All relevant evidence necessary for equitable disposition of the veteran's appeal has been obtained by the regional office (RO).

2. Service connection for lumbar spine and right leg disorders was previously denied by BVA in regular appellate or reconsideration decisions entered in December 1948, December 1972, August 1976, December 1976, and July 1978, and service connection for a lumbar spine disorder, secondary to service-connected pes planus, was denied by BVA in regular appellate or reconsideration decisions entered in April 1968 and July 1978.

3. Evidence added to the record since entry of the BVA decision in July 1978, which reconsidered all prior BVA decisions denying entitlement to service connection for lumbar spine and right leg disorders, largely is duplicative of previously submitted materials, cumulative, or refers to disabilities unrelated to the entities at issue; it otherwise provides no reasonable possibility of a change in the outcome of the most recent denial.

4. This case does not present a question of medical complexity or controversy as to warrant obtaining an opinion from an independent medical expert.

## CONCLUSIONS OF LAW

1. The BVA's decisions of December 1948, April 1968, December 1972, August 1976, December 1976, and July 1978, denying service connection for lumbar spine and right leg disorders, are final; evidence received by VA since entry of the most recent BVA decision in July 1978 is not both new and material, and the previously denied claim is not now reopened. 38 U.S.C.A. §§ 5107, 5108, 7105 (West 1991); 38 C.F.R. §§ 3.156, 20.1100, 20.1105 (1993).

2. An opinion from an independent medical expert is not warranted in this matter. 38 U.S.C.A. § 7109 (West 1991); 38 C.F.R. § 3.328 (1993).

## REASONS AND BASES FOR FINDINGS AND CONCLUSIONS

As noted above, BVA has previously considered the issues of the veteran's entitlement to service connection for lumbar spine and right leg disorders on one or more bases and, in each instance, the benefit sought has been denied. In this regard, we note that the regular appellate and reconsideration decisions of BVA entered in December 1948, April 1968, December 1972, August 1976, December 1976, and July 1978 are final. 38 U.S.C.A. § 7104; 38 C.F.R. § 20.1100. In light of the veteran's recent request to reopen the previously denied claim, the matter now under consideration is whether new and material evidence has been presented which would permit the veteran to reopen the previously denied claim of entitlement to service connection for lumbar spine and right leg disorders.

Insofar as the VA's duty to the veteran to assist him in the development of all facts pertinent to his claim is concerned, it is evident that actual radiographs of the veteran's spine, which were previously of record and considered by BVA in its August 1990 decision, were removed from the record in November 1990 at the veteran's request. In his statement of November 9, 1990, the veteran specifically noted that the X-rays were needed by a treating physician for management of a progressive spinal disorder and he acknowledged within such statement that the release of the X-rays might compromise his appeal. In a Report of Contact, dated in November 1990, from the RO's Adjudication officer it was indicated that the X-rays had been released to the veteran, although a copy of the written summary of radiographic findings was to be retained in the veteran's claims file. The record appears to be otherwise intact and we are satisfied, following our review of the record, that all relevant facts have been properly developed, with no useful purpose being served by remanding the case to the RO for further action. As well, an additional opinion from an independent medical expert is not judged to be needed, inasmuch as the issues presented by this appeal do not now involve any significant medical complexity or controversy. 38 U.S.C.A. § 7104; 38 C.F.R. § 3.328. Such is the case in light of previously secured opinions from noted medical experts in orthopedics and neurology and consideration of the instant appeal under the analysis enunciated in *Manio v. Derwinski*, 1 Vet.App. 140 (1991). It is particularly noteworthy that the concerns of the veteran regarding the expert opinion of May 1976 by L.W. Jarcho, M.D., were

fully addressed in the BVA decision of July 1978; the opinion offered by experts, C. Frankel, M.D., and A. Butler, M.D., in March 1978 was based on their review of the entirety of the claims folders and contained no actual notation or implication that the opinion offered was rendered equivocal because of the absence of actual radiographs of the veteran's spine. For the reasons noted, VA is found to have no further obligation to assist the veteran in the development of facts involving the matter now before BVA. 38 U.S.C.A. § 5107(a).

Evidence contained within the claims folder at the time of and prior to entry of the BVA's reconsideration decision of July 1978 consisted of service medical and personnel records, examination and treatment reports compiled by VA and non-VA physicians, opinions from independent medical experts and the Chief Medical Director of VA, transcripts of hearings afforded the veteran, and various other items, all of which were filed in three volumes of the veteran's claims folder.

Prior to the veteran's entrance onto active duty, he was afforded a medical examination by the service department in December 1942, when it was set forth that he had suffered osteomyelitis of the right tibia in 1919 and a complete fracture of the right tibia in 1939. X-ray films in December 1942 identified osteosclerosis of the midshaft of the right tibia, but without other evidence of active osteomyelitis. On examination at service entrance in May 1944, the veteran's history of osteomyelitis with a well-healed scar of the right tibia was found to be a disqualifying defect; although his acceptance for limited military service was recommended. On the occasion of a routine physical examination in October 1944, the veteran indicated that he was experiencing right leg pain following exertion. Three surgical procedures involving the right leg were noted to have been undertaken in the past. X-ray films of the right leg identified a slight disturbance in the structure of the tibia slightly below the midshaft region consisting of slight sclerosis and irregularity of the anterior margin of the bone. The noted findings had the appearance of an old healed injury and it was noted that the alignment of the shaft of the tibia was normal. Clinically, there was noted to be a healed, irregular scar approximately 6 inches in length over the junction of the middle and lower thirds of the right tibia. The scar was adherent to the bone and moderately tender to pressure. There was no evidence of atrophy of the musculature.

The veteran was hospitalized at a service department facility in June 1945 for evaluation of gastrointestinal complaints, in addition to a complaint of pain in the right leg. His pain reportedly was intermittent and associated with some increase in local heat about the old scar of the right tibia. Approximately one month before the hospital admission, a very small spicule was noted to have exuded from the old scar area. X-rays in July 1945 showed cortical hyperplasia of the midaspect of the tibial shaft along its lateral border, without evidence of an active process. Clinical review in July 1945 disclosed a scar over the anterior portion of the right leg from chronic osteomyelitis, in addition to a left lateral scoliosis of the lower lumbar spine and some atrophy of the thigh and leg muscles on the right in the range of 1/2 to 1 inch.

When evaluated in October 1945, it was noted that the veteran had been taking codeine in doses from 1/2 grain to 3 grains daily since December 1944 for relief of right leg pain at the site of his old osteomyelitis. A retirement medical examination in December 1945 revealed a right leg scar from prior osteomyelitis, atrophy of the right thigh muscles, and tenderness of the medial and lateral aspect of the right tibia. No activity of the veteran's osteomyelitis was disclosed and it was noted that an orthopedic consultant had previously concluded that prominence of bone sclerosis might account in some measure for the veteran's complaints of right leg pain. The veteran was thereafter determined by a Disposition Board comprised of medical officers to be incapacitated for active service because of chronic, inactive osteomyelitis of the right tibia which was found to be unchanged and in existence prior to service entrance, and an unrelated disorder. His discharge from service was effected on that basis by action of an Army Retiring Board for Officers.

Also shown by the evidence of record in July 1978 was that, during post service years, medical assistance was initially received for back-related complaints in September 1946, at which time the presence of a "weak back" was diagnosed. X-rays of the lower spine in April 1947 identified some asymmetry of the first sacral segment due to a lack of fusion with the ilium on the right side, which was noted to be a developmental variation. Subsequent examination and testing led to entry of varying diagnoses involving the back, including mechanical strain of the back, lumbosacral strain superimposed on congenital anomalies of the spine, underlying disc pathology, and various congenital and/or developmental entities involving lumbarization of the first sacral segment resulting in the presence of six lumbar vertebrae, spina bifida, sacralization of the transverse process of the fifth lumbar vertebra, and displaced facets of the lumbar vertebrae.

As to the right leg, prior evidence revealed that the veteran sought medical assistance subsequent to his service discharge in April 1947 for a complaint of right leg pain, although such complaint was not specifically attributed to any of the diagnoses offered. The existence of shortening and atrophy of the right leg was subsequently shown on clinical evaluations, and at least one private physician specifically concluded that the right leg atrophy was not the result of the veteran's preservice osteomyelitis.

In light of inconsistencies within the evidence and conflicting statements as to the nature and origin of the disorders in question, BVA sought assistance from the VA's Chief Medical Director. The Chief Medical Director in an opinion of April 1973 determined that the veteran's inservice right leg problems were the result of his preservice osteomyelitis and right leg fracture that the inservice finding of a left lumbar scoliosis was an incidental one unverified by X-rays, that the 1946 diagnosis of a "weak back" was inappropriate, with it being impossible to relate any such "weak back" to pathology of the lower spine. No etiological relationship was noted to be present between the veteran's back and right leg disorders, and there

reportedly was no evidence to support a private physician's diagnosis of radiculitis. Shortening of the veteran's right lower extremity by 1 inch, as noted on examination in October 1944, was found to be the result of the veteran's prior osteomyelitis and right leg fracture.

Similar findings were provided to BVA by an independent medical expert consulted by BVA in May 1976. The expert, a neurologist, concluded that the veteran's back and right leg disorders were interrelated, and that the pain, atrophy, and leg length discrepancy involving the veteran's right leg were in all probability present prior to service and were related to the preservice bout of osteomyelitis and an old fracture of the right tibia. Leg measurements recorded from October 1944 to February 1948 were not found to suggest progressive atrophy and there was found to be no inservice evidence of radiating back pain or a related neurological deficit. It was confirmed that the correct diagnosis of the veteran's back disorder was a congenital anomaly in which the first sacral vertebra had failed to fuse with the pelvis on the right side during the original development of the veteran's skeleton. No etiological relationship was noted to be present between any back disorder of the veteran and disability of his leg or foot.

Orthopedic experts consulted by BVA during 1978 indicated in their written report that, while the etiology of the atrophy of the veteran's right leg was unclear, it was likely due to the preexisting tibial fracture and osteomyelitis, rather than to the alleged inservice injury. Any neurological deficit of a sensory nature in the S1 and S2 dermatomes was noted to be unproven and otherwise unaccompanied by any corroborative findings. The experts were skeptical that the alleged inservice back injury led to any real muscle weakness or other neurological finding of an objective nature. The correct back-related diagnosis was found to be most probably lumbosacral strain, although if the strain had been as serious as alleged, it should have manifested itself within at least 24 hours of the alleged injury, which treatment records did not indicate. Statements by various physicians that the numerous con-

genital anomalies of the veteran's spine were responsible for at least some of the veteran's back-related complaints were not felt to be borne out by common knowledge among most orthopedic surgeons that X-ray findings in practically all of the cases bear no relation to the symptoms. Further consideration of the etiology of the type of pain complained of by the veteran pointed to the possibility of spinal stenosis. With regard to the anatomic variation on the lower lumbosacral region, it was the opinion of the experts that the sacralization and spina bifida occulta were not producing the veteran's back-related complaints. No causal relationship between the veteran's alleged back disorder and his right leg disability was noted. Atrophy of the right leg was felt to be due to disuse and was related to the preexisting pathology involving osteomyelitis and a fracture of the right tibia. No neurologic manifestations were found to have been demonstrated by electromyogram, myelogram, or repeated examinations of muscular and neural function. The flat feet for which the veteran was receiving compensation were not judged to be a factor in the development of a so-called disc syndrome.

Previously, the veteran had alleged, in part, that a treating physician, Dr. Dammon, had determined that his pes planus, for which service connection previously was granted, had altered his walking mechanism, thereby causing low back problems. Dr. Dammon's one and only report, dated in August 1967, indicated, however, that the veteran's back pathology was attributed to congenital anomalies of the veteran's back and that the pes planus only exacerbated his back-related symptomatology. There was no notation of any proximate causal relationship between the two entities.

Evidence added to the record since entry of the most recent BVA decision denying entitlement to service connection for back and right leg disorders consists of numerous examination and treatment reports, only a few of which specifically concern the veteran's back and/or right leg disabilities. Other items include the credentials of the medical expert consulted by BVA in 1976 and the Dean of the medical school assigning the

expert the task of reviewing the case, a billing statement from a private physician who treated the veteran for an unrelated disorder during 1982, duplicate copies of previously submitted materials, VA administrative documents relating to hospitalizations of the veteran for unrelated disorders, a transcript of a hearing afforded the veteran in May 1989, various photographs reportedly of the veteran, and abstracts of medical literature.

Of the pertinent entries in examination and treatment records, one involves an incidental finding by a private treating physician in 1982 with respect to a noted vascular compromise of the veteran's right lower extremity due to an old soft tissue injury. The derivation of the soft tissue injury was not specified, nor was the location of the vascular compromise, but we note that such statement was provided in connection with the veteran's convalescence from surgery in March 1982 for removal of a bony exostosis from a toe.

Recently received evidence indicates private medical treatment was received in July and August 1988 for complaints of back pain radiating to the right lower extremity. At that point in time, the veteran was of the belief that the lower transverse process at L5 was producing his back-related symptoms, and he sought its removal. X-ray films were consistent with the presence of degenerative disc disease and neurological evaluation, including an electromyogram, identified S1 and L5 radiculopathy. A magnetic resonance imaging study disclosed diffuse lumbar disc disease, with mild tethering of the spinal cord. The veteran was seen by another orthopedic specialist in December 1988, and findings from examination and testing led to entry of a diagnosis of lumbar spinal stenosis. A physical therapy evaluation of the veteran's right knee was undertaken in April 1989, which showed weakness of the right quadriceps and minimal weakness of the right hamstrings, as compared to the left.

The veteran was afforded a hearing before the hearing officer at the Ro in May 1989, at which time he set forth his belief that any preservice back and right leg disorders were asymptomatic for years prior to service entrance and that the rigors of basic training

triggered the onset of neurological damage of the spine which adversely affected his right lower extremity. According to the testimony, right leg atrophy reportedly developed in July 1945 as a result of the neurological changes and was accompanied later by muscle weakness. Other witnesses testified that they were able to detect by visual observation that the veteran's right thigh was smaller than his left thigh. It was the veteran's assertion that such atrophy had been present to the same degree since July 1945, although none of the other witnesses offered testimony supporting that claim. Deficiencies with respect to the opinions of independent medical experts were cited, including the relationship of one or more of such experts to VA, and their erroneous findings that right leg atrophy preexisted service entrance and was the result of preexisting osteomyelitis and a right tibial fracture, with subsequent disuse. The expert opinions are alleged to have been based on inadequate information provided by BVA as to the existence of the presumption of soundness and the type of evidence required to rebut it, as well as the absence of actual X-rays involving the veteran's spine. Testing in the recent past was noted to have identified muscle weakness of the right quadriceps, thereby challenging earlier references in the record which supposedly indicated that the veteran was feigning muscle weakness.

Also submitted are three photographs reportedly of the veteran. One such photograph, allegedly taken in January 1919, is of the veteran as a small boy; the other two photographs depict an individual of advanced age, whose right thigh is smaller than his left thigh.

Offered by the veteran's attorney in his letter of March 1992 are six abstracts from medical journals, reportedly offered to show that muscle atrophy is not a residual of childhood osteomyelitis, and that muscle atrophy following disuse will gradually disappear upon a resumption of normal activities, provided that the muscle is not permanently damaged.

"New" evidence means more than evidence which was not previously physically of rec-

ord. To be "new," the additional evidence must be more than merely cumulative. *Colvin v. Derwinski,* 1 Vet.App. 171 (1991). Those newly received items bearing any relevance to the matter under consideration include the report of A. Dobranski, M.D., which was submitted to VA in May 1981, and such item is an exact duplicate of that submitted to VA personnel on multiple occasions prior to July 1978. The photocopy of the credentials of individuals involved in obtaining the opinion of an independent medical expert in 1976, reflecting their association with VA, was previously not of record, although the veteran had communicated that information to various VA personnel, such that action was taken to obtain expert opinions from others unaffiliated with VA. The reports of medical treatment compiled in 1988 and 1989, the transcript of the hearing held in May 1989, the photographs of the veteran, and the abstracts from medical journals were all absent from the record in July 1978. Yet, the medical data of 1988 and 1989 identify the existence of disorders affecting the lower spine, as did medical evidence received into the record prior to July 1978, albeit of a differing variety. Much of the testimony offered by the veteran and others at the 1989 hearing cannot be considered "new," inasmuch as its principal thrust was that the veteran now suffers from muscle atrophy of the right thigh which we note was clearly disclosed in pre–1978 examination and treatment reports. Many of the bare allegations advanced were offered in an attempt to challenge the BVA's findings and conclusions in prior decisions and the evidence utilized in rendering same; most were set forth previously in the context of BVA reviews undertaken between 1948 and 1978 and disposed of in prior BVA decisions.

That evidence which is "new" may not be considered to be "material." As previously stated, the bulk of the post-July 1978 evidence has no bearing whatsoever on the veteran's attempt to reopen his claim for service connection for back and right leg disorders. Assuming, without deciding, that the remaining evidence is relevant and probative, there is no reasonable possibility that such evidence, when viewed in the context of all the evidence, both new and old, would provide a

reasonable basis for a grant of service connection for a right leg disorder either on the basis of direct incurrence or aggravation, or for a back disorder on the basis of direct incurrence or aggravation or a secondary relationship to service-connected pes planus. *See Colvin, supra,* and *Smith v. Derwinski,* 1 Vet.App. 178 (1991). Much of the newly received evidence does not provide a link between the claimed back and right leg disorders and the veteran's period of military service or a disability related thereto. The showing in 1982 of a vascular compromise of the right foot due to an old soft tissue injury, degenerative disc disease with radiculopathy and spinal stenosis during 1988, and mild weakness of the right quadriceps in 1989 establishes only the presence of disability during a relatively compressed period of time from 1982 to 1989, as opposed to the pertinent time frame during the period of service from May 1944 to February 1946. Moreover, the clinical evidence presented is inconsistent with the existence of any etiological relationship of the alleged back disorder to the veteran's service-connected pes planus.

The testimony offered by the four witnesses, other than the veteran, at the May 1989 hearing as to the presence of right thigh atrophy is of no assistance in determining whether such atrophy is in some way related to service completed more than 40 years prior to the hearing. The veteran's own testimony was essentially a restatement of previously argued points and an attack on the opinions of independent medical experts in orthopedics and neurology, who were consulted previously by BVA. Aside from his questioning of the witnesses, the veteran principally rehashed "old" evidence and advanced stale arguments challenging the medical opinions relied on by BVA in prior decisions. He commented on the purported failure of BVA to provide information to the experts consulted regarding the presumption of soundness and the standard of proof required to overcome it, but such an argument is faulty as it would require the experts to render not medical opinions, but legal conclusions outside their field of expertise. Reference to the 1989 showing of mild mus-

cle weakness of the right quadriceps and hamstrings was made in a failed attempt to discredit the expert opinion in 1978 that no muscle weakness was then shown by the record. The identification of muscle weakness in 1989, following the initial entry of confirmed diagnoses of lumbar disc disease and spinal stenosis, and in the absence of accompanying documentation as to its linkage to any preservice back or leg disorder or any event occurring in service, is essentially meaningless in context of the veteran's quest to reopen his claim.

Although the veteran is a trained physician, now retired, his testimony is not viewed as that of an expert witness in light of his stake in the outcome of his mission to obtain additional VA compensation. While the self-serving arguments set forth in his testimony are many, they are unaccompanied by any salient evidence providing a reasonable basis for a grant of service connection for a lumbar spine or right leg disorder. The recent photographs of the veteran which identify atrophy of his right thigh, as well as the photograph of a small boy, reportedly the veteran, dressed in various layers of clothing and footwear, add essentially nothing to the veteran's attempt to reopen the previously denied claim. The abstracts cited by the veteran's attorney, reportedly to show that muscle atrophy is generally not considered to be a residual of osteomyelitis and that disuse atrophy is reversible, create no reasonable possibility of a change in the most recent previous denial. This is so because various medical experts and others, whose opinions BVA previously held to be highly persuasive, attributed the right thigh atrophy to not only the preservice osteomyelitis, but also to the preservice *right tibial fracture and found that it antedated service.* Even if we were to assume for the sake of argument that the atrophy is, as alleged, a direct result of the claimed inservice back injury, the post-July 1978 evidence is lacking in failing to confirm the inservice back trauma or injury, including the incident involving the litter carrying exercise. Moreover, none of post-July 1978 evidence establishes that the right thigh atrophy represents an increase in severity of the preexisting back or leg disorders or is a manifestation of some other entity. Lastly,

an etiologic relationship between service-connected pes planus and any back disorder is not in any way defined by the post-July 1978 materials.

Following a review of the entire evidentiary record, we conclude that the evidence submitted subsequent to the appellate decision entered in July 1978 is not new and material. 38 C.F.R. § 3.156(a). Accordingly, the veteran's claim of entitlement to service connection for lumbar spine and right leg disorders is not now reopened and the prior BVA decisions remain final. 38 U.S.C.A. §§ 5108, 7104.

### ORDER

New and material evidence has not been submitted to reopen the veteran's previously denied claim of entitlement to service connection for lumbar spine and right leg disorders and, to that extent, the appeal is denied.

BOARD OF VETERANS' APPEALS
WASHINGTON, D.C. 20420

\*_____

/s/ B. Kannee
    B. KANNEE

/s/ Albert D. Tutera
    ALBERT D. TUTERA

---

\* 38 U.S.C.A. § 7102(a)(2)(A) (West 1991) permits a Board of Veterans' Appeals Section, upon direction of the Chairman of the Board, to proceed with the transaction of business without awaiting assignment of an additional member to the Section when the Section is composed of fewer than three Members due to absence of a Member, vacancy on the Board or inability of the Member assigned to the Section to serve on the panel. The Chairman has directed that the Section proceed with the transaction of business, including the issuance of decisions, without awaiting the assignment of a third Member.